# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JAMES R. THOMAS and LINDA S.
THOMAS,

      Plaintiffs,

v.                                                                Case No. 3:14-cv-172-J-32PDB

CITY OF PALM COAST, <u>et</u> <u>al.</u>,

      Defendants.

_____

# O R D E R

In this Section 1983 action, <u>pro</u> <u>se</u> Plaintiffs James and Linda Thomas allege that Defendants, the City of Palm Coast and its employees, violated their Fourth Amendment rights by coming on their property in connection with municipal enforcement efforts. Pending before the Court are cross motions for summary judgment (Docs. 103, 114) and Plaintiffs' Motion to Strike Defendants' Filed Affidavits (Doc. 116).

## I.    BACKGROUND & UNDISPUTED FACTS

On February 25, 2010, Plaintiffs locked two male dogs inside a vehicle in their driveway so the males would be separated from female dogs in heat that remained in the house. Around 12:30 p.m., a mail carrier called City of Palm Coast Animal Control Officer Shelly Adorante to report the dogs locked inside the vehicle. About twenty minutes later, Defendant Adorante arrived at the residence and saw two dogs inside the vehicle. Adorante knocked on the front door of the Thomases' home, but no one

answered. From her position on the front porch, through the front living room window with open curtains, Adorante saw four additional dogs inside the home.

Adorante called a telephone number listed on a truck parked in the driveway and left a message about the dogs. When Adorante called the number a second time, she spoke with Linda Thomas, who advised that they locked the dogs in the car because they did not want any unwanted puppies, and told Adorante that the Thomases would be home in an hour. Adorante then brought up the number of dogs inside the home, at which point Linda Thomas became angry and told Adorante that she was not allowed to look inside the windows or in her backyard. Adorante took photographs of the dogs inside the vehicle and the dogs inside the home, which also show a large boat in the backyard, and thereafter posted a notice on the Thomases' front door and left the property.

At about 1:45 p.m., Adorante returned to the Thomases' home to follow up and saw that the dogs were still locked inside the vehicle and no one was home. Adorante then called fellow Animal Control Officer Eva Boivin and Animal Control/Code Enforcement Officer Mike Hadden to assist. When Hadden arrived, he parked his truck on the street in front of the house and was able to see a large catamaran in the back yard and another boat on the back of the adjacent empty lot. Hadden also observed two dogs inside the vehicle, and was advised that there were four other dogs inside the home and a third boat in the back yard behind the house. Adorante, Hadden, and Boivin walked around the right side of the house to determine if there were additional dogs in the back yard.

Without entering the backyard, which was enclosed with a chain link fence, Adorante, Hadden, and Boivin were able to observe from the side yard that there were no additional dogs in the back yard, but observed the third boat, a large ski boat, directly behind the home (the same boat Adorante had seen through the front living room window). Hadden also saw three garbage cans and debris in front of the garage, which violated City code. Hadden wrote a warning notice for the Thomases to remove the boats from their property and put the garbage cans out of view. Because the dogs in the vehicle did not appear to be in distress, Adorante did not take action to have the dogs removed but posted a citation for animal cruelty on the Thomases' garage door. Adorante photographed the citation and left the residence at approximately 3:00 p.m. The Thomases had still not returned home. When the Thomases finally returned home shortly thereafter, no City employees were at the property.

James Thomas moved two of the boats soon after February 25, 2010, but the boat that was located on the concrete slab directly behind the Thomases' home remained there until the end of April 2010. Neither Adorante nor Boivin ever returned to the Thomases' home for any reason. Hadden returned several times to determine if the boats had been removed and the garbage cans placed out of sight. When Hadden returned on March 2, 2010, the garbage cans were out of view and two of the three boats had been removed. The large ski boat directly behind the home was still present when Hadden made follow up visits on March 10, 25, and 30, and April 7, 2010. When Hadden returned again on April 21, 2010, the large ski boat had finally been removed. No other City employees accompanied Hadden on any of the follow up visits.

3

On Hadden's five visits in March and April, he did not encroach on the Thomases' property, but instead walked onto an adjacent lot from which he could observe whether the boats remained. On the final April 21, 2010 visit, after walking onto the adjacent lot and determining the last boat was gone and the Thomases were therefore in compliance, Hadden walked onto the Thomases' property to post a notice of hearing on their garage door, at which time the Thomases returned home. A Flagler County Sheriff was also present at the Thomases' property. After James Thomas removed the notice of hearing from the garage and placed it onto the windshield of Hadden's vehicle, the Sheriff removed the notice and placed it onto the Thomases' mailbox. Hadden then left the property and did not return.

The Thomases subsequently met with Nestor Abreu, Director of Community Development, to resolve the citations for the dogs and boats. Abreu advised them that the matter would be handled by the Code Enforcement Board. James Thomas did not speak with Jim Landon, Barbara Grossman, Debra Chaudoin, Michael Donovan, Adorante, Boivin, or any City employee, other than Hadden, while Hadden was at the Thomases' property. Linda Thomas met with Barbara Grossman, a Code Enforcement Manager, to discuss her issues with Animal Control, and Grossman told Linda Thomas to appeal.

After receiving unfavorable rulings from a Hearing Officer and the Code Enforcement Board with respect to both the citation for the dogs and the citation for the boats and garbage cans, the Thomases appealed to state court, which reversed the findings in both cases. See Thomas v. City of Palm Coast, No. 2010 CA 001202 (Fla.

Cir. Ct.); Thomas v. City of Palm Coast, No. 2010 CA 001339 (Fla. Cir. Ct.). The court determined that the facts presented at the hearing did not support the animal cruelty citation, and that the Thomases were not afforded due process during the administrative proceedings because they were not provided an opportunity to raise the constitutional challenges that they now assert. On remand, rather than hold another hearing, the City dismissed the citations.

Plaintiffs' "Third Amended Complaint"[1] (TAC), the operative complaint, was filed on March 1, 2016. (Doc. 84.) The parties have now completed discovery and filed cross motions for summary judgment.

## II.  STANDARD OF REVIEW

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The movant bears the burden of showing the absence of dispute as to material facts, and upon such a showing the burden shifts to the non-moving party to establish that a genuine dispute exists. Celotex Corp. v.

---

[1] Although only the second amended complaint, it is erroneously titled "Third Amended Complaint." For ease of reference and clarity, the Court refers to the title as it appears on the document.

Catrett, 477 U.S. 317, 323-24 (1986). The evidence must be viewed in favor of the non-moving party, and all inferences drawn in his favor. Anderson, 477 U.S. at 255.

## III.   DEFENDANTS' DISPOSITIVE MOTION FOR SUMMARY JUDGMENT (DOC. 103)

### A.   42 U.S.C. § 1983 – Unreasonable Search

#### 1.   Defendant City of Palm Coast

The TAC contains three Section 1983 claims against the City: Count One (alleges unreasonable searches and violations of the right to be secure in their home); Count Ten (violation of Plaintiffs' right to substantive due process)[2]; and Count Twelve (failure to train, supervise, and discipline employees). Count One alleges, in largely conclusory fashion, that the City violated Plaintiffs' rights by and through its customs, policies, and practices, and the City's failure to take disciplinary or corrective action after the alleged events underlying this action. (Doc. 84 ¶¶ 144-49.) Count Twelve alleges, again in conclusory fashion, that the City fails to train, supervise, and discipline its employees, and that such failure resulted in violations of Plaintiffs' constitutional rights. (Doc. 84 ¶¶ 203-07.)

A municipality generally cannot be held vicariously liable under Section 1983 for constitutional violations committed by its employees. Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016). However, a municipality may be liable if a plaintiff can show the municipality has an unconstitutional policy, custom, or practice, or fails to train its employees; but, only a "long-standing and widespread practice" is

---

[2] Count Ten is discussed more fully in part III.B., infra, but summary judgment is also warranted on this count because the City cannot be held vicariously liable for the reasons set forth in this section.

sufficient and plaintiffs cannot rely solely on their own alleged violations to prove the existence of a widespread practice. <u>Brown v. City of Fort Lauderdale</u>, 923 F.2d 1474, 1480, 1481 (11th Cir. 1991); <u>Craig v. Floyd Cnty., Ga.</u>, 643 F.3d 1306, 1310-11 (11th Cir. 2011). Here, there is no evidence of a City policy, custom, or practice that was authorized or condoned by a City policymaker, and merely relying on their own unsupported allegations is insufficient for Plaintiffs to overcome summary judgment.

To prevail on a Section 1983 failure to train claim, Plaintiffs must show a history or pattern of constitutional violations by untrained City employees. <u>Connick v. Thompson</u>, 563 U.S. 51, 62 (2011). Plaintiffs must establish that the City knew of a specific training need and deliberately chose not to take action. <u>Gold v. City of Miami</u>, 151 F.3d 1346, 1350 (11th Cir. 1998). Even if Plaintiffs could show deliberate inaction, they must still show that the alleged failure to train in a relevant respect amounts to deliberate indifference to their rights. <u>City of Canton v. Harris</u>, 489 U.S. 378, 388-89 (1989). To demonstrate the requisite deliberate indifference, Plaintiffs must show that the City had actual notice of an unconstitutional practice, or constructive notice as established by a history of prior widespread abuse. <u>Id.</u> Without such notice, the City cannot be held liable for failure to train and supervise as a matter of law. <u>Gold</u>, 151 F.3d at 1351.

While it appears that the City did not offer Fourth Amendment training <u>per se</u>, Plaintiffs have not shown a history of unconstitutional actions by City Animal Control or Code Enforcement or evidence that the City knew of a specific need for training and deliberately chose not to provide it, and that the City was deliberately indifferent to

Fourth Amendment rights. Accordingly, the City is not liable for failure to train its employees under Section 1983.

### 2. **Individual Defendants**

#### a. *Landon, Abreu, Chaudoin, and Donovan*

In Counts Two (Landon), Three (Abreu), Five (Chaudoin), and Six (Donovan), Plaintiffs allege that Defendants, in their individual capacities, violated Plaintiffs' Fourth and Fourteenth Amendment rights based on their "conduct and/or failure to act." Plaintiffs allege that Landon, by virtue of his position as City Manager, failed to take any corrective or disciplinary action against any of his subordinates regarding the alleged events underlying this action. (Doc. 84 ¶¶ 150-53.) Plaintiffs allege that Abreu, as Director of Community Development, violated their constitutional rights through his conduct and/or failure to act, which deprived Plaintiffs of their rights under the Fourth Amendment. (Doc. 84 ¶¶ 154-58.) Plaintiffs include similar allegations in Count Five against Chaudoin and Count Six against Donovan by virtue of their roles as Code Enforcement Supervisors. (Doc. 84 ¶¶ 163-66, 167-70.)

Supervisory liability under Section 1983 must be based on more than respondeat superior. <u>Braddy v. Fla. Dep't of Labor and Emp't Sec.</u>, 133 F.3d 797, 801-02 (11th Cir. 1998). To be liable, a supervisor must either personally participate in the alleged constitutional violation or the plaintiff must show that there is a causal connection between the supervisor's actions and the alleged constitutional deprivation. <u>Matthews v. Crosby</u>, 480 F.3d 1265, 1270 (11th Cir. 2007). To show the requisite "causal connection," a plaintiff can establish that: (1) a history of widespread abuse puts the supervisor on notice of the need to correct the alleged deprivation; (2)

the supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed the subordinates to act unlawfully, or knew they would do so and failed to stop them. Id.

The undisputed facts show that none of these individual Defendants personally participated in the alleged unconstitutional search of Plaintiffs' property, and there is simply no evidence of a "history of widespread abuse" to put them on notice of a need to correct the alleged deprivation. Nor is there evidence of a custom or policy of deliberate indifference, or that any of these Defendants directed anyone to act unlawfully or knew they would do so but failed to stop them.

### b.   All named individual Defendants

In addition to the claims against supervisory employees discussed in Part III.A.2.a, supra, Defendants Grossman, Adorante, Boivin, and Hadden are each named in their individual capacities in Section 1983 claims alleging unreasonable search and violations of Plaintiffs' right to be secure in their home (Counts Four, Seven, Eight, and Nine, respectively). All of the named individual Defendants claim entitlement to qualified immunity.

To benefit from qualified immunity, Defendants must show that each was acting within the scope of his or her discretionary authority when the alleged constitutional deprivation occurred. Kingsland v. City of Miami, 382 F.3d 1220, 1231 (11th Cir. 2004). Here, Plaintiffs expressly allege that the individual Defendants were acting within the scope of their employment with the City. (Doc. 84 ¶ 15.) Therefore, the individual Defendants are entitled to qualified immunity unless Plaintiffs can show that the facts, taken in the light most favorable to them, show: (1) a

constitutional violation; and (2) that the illegality of the individual Defendants' actions was clearly established at the time. Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

"A constitutional right is clearly established if controlling precedent has recognized the right in a 'concrete and factually defined context.'" Chesser v. Sparks, 248 F.3d 1117, 1122 (11th Cir. 2001). Thus, in Florida, a plaintiff can show that a right was clearly established by pointing to a materially similar case decided by the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Florida Supreme Court. Terrell v. Smith, 668 F.3d 1244, 1255 (11th Cir. 2012). A plaintiff may also demonstrate that a right was clearly established by showing that a "broader, clearly established principle" should control the particular novel facts. Id. When relying on a broad principle,

> the principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted. In other words, an official action is not protected under qualified immunity simply because the very action in question has not been held unlawful before, but in the light of pre-existing law the unlawfulness must be apparent.

Id. at 1256 (citations and quotation marks omitted). Alternatively, "the conduct involved in the case may so obviously violate[ ] th[e] constitution that prior case law is unnecessary." Id. at 1255 (alteration in original) (internal quotation marks omitted).

10

Plaintiffs rely in part on two Attorney General Opinions addressing the authority of code enforcement personnel, which stand for the proposition that:

> A local government code inspector is not authorized to enter onto any private, commercial or residential property to assure compliance with or to enforce the various technical codes or to conduct any administrative inspections or searches without the consent of the owner or the operator or occupant of such premises, or without a duly issued search or administrative inspection warrant.

2002 Op. Att'y Gen. 2002-27 (April 4, 2002); see also 1984 Op. Att'y Gen. 84-32 (April 2, 1984) (same). Though these Attorney General opinions are intended to offer guidance to local governments, they are not binding Fourth Amendment precedent. See, e.g., A.B.T. Corp., Inc. v. City of Fort Lauderdale, 664 F. Supp. 488, 492 (S.D. Fla. 1987) ("Attorney general Opinions are not binding on courts in Florida, but such opinions are 'entitled to weight' when construing the Florida Statutes." (quoting Fla. Indus. Comm'n v. Schoenberg, 117 So. 2d 538, 543 n.5 (Fla. Dist. Ct. App. 1980)). Moreover, even accepting that general Fourth Amendment requirements apply to municipal code inspectors, there are other Fourth Amendment principles at play here as well.

Clearly established Fourth Amendment law holds that which a person knowingly exposes to public view is not subject to Fourth Amendment protections, and that City employees are not required to close their eyes to avoid observing that which is visible from a place where the public is lawfully able to be. See Florida v. Riley, 488 U.S. 445, 449 (1989) ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); California v. Ciraolo, 476 U.S. 207, 213 (1986) ("That the area was within the curtilage does not

itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible."); United States v. Whaley, 779 F.2d 585, 591 (11th Cir. 1986) (defendant did not have a reasonable expectation of privacy as to activity which could be viewed with naked eye from position on neighboring property, and "could not have reasonably expected the activity in his basement to be private as long as he failed to cover his windows. He conducted his activity in plain view ….").

Even where officers' investigations took place in a constitutionally protected area, courts address whether it was accomplished through an unlicensed physical intrusion. Florida v. Jardines, 133 S. Ct. 1409, 1415 (2013). The United States Supreme Court has explained that, "[w]hile law enforcement officers need not 'shield their eyes' when passing by the home 'on public thoroughfares,' an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas." Id. (quoting Ciraolo, 476 U.S., at 213). When making this inquiry,

> "[a] license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait

briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do."

Jardines, 133 S. Ct. at 1415-16 (footnote and citations omitted). See also LaFave, 1 Search & Seizure § 2.3(e) (5th ed. Oct. 2016) ("The route any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open, and thus it is permissible for them to look into a garage or similar structure from that location. On the other hand, if the police depart from that route and go to other, more private parts of the curtilage in order to look into a structure there, this constitutes a search, even if the police might have been able to (but didn't) make the same observation from outside the curtilage. … When the conduct of the officer in gaining access to the vantage point is itself unobjectionable, privacy interests are not threatened by allowing the officer so positioned to use his naked eye to look into a garage, barn or shed through an open door or an uncovered window. In such a case, it cannot be said that the occupant of those premises has done as much as ordinary care requires." (footnotes omitted)).

While Florida recognizes a constitutionally protected privacy interest in the back and side yards of one's home, "[u]nder Florida law, it is clear that one does not harbor an expectation of privacy on a front porch where salesmen or visitors may appear at any time." State v. Morsman, 394 So. 2d 408, 409 (Fla. 1981); cf. Lollie v. State, 14 So. 3d 1078, 1079-80 (Fla. Dist. Ct. App. 2009) ("[T]he Florida Supreme

Court's decision in <u>Morsman</u> ... clearly establishes that residents have a constitutionally-protected privacy interest in the side and backyard area of their home."). <u>But see</u> <u>Manseau v. City of Miramar</u>, 395 F. App'x 642, 645 (11th Cir. 2010), in which the Court upheld the dismissal of <u>pro se</u> plaintiffs' Section 1983 claim against the city and city officials, stating:

> Plaintiffs also argued that Defendants violated their Fourth Amendment rights against unreasonable searches by searching, without a warrant, their home and property for code violations. Plaintiffs based this claim on the citations they received for certain vehicles and their lack of an occupational license. But no unreasonable search occurred of the vehicles located in the Plaintiffs' driveway. *See California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 1812, 90 L.Ed.2d 210 (1986) (explaining that the "Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares"). Plaintiffs noted that they took measures to prevent people from seeing into their yard by erecting a six-foot fence. But code officers violated no Fourth Amendment right by looking over the fence, especially given that Plaintiffs did not allege that the officers were looking from a vantage point where they did not have the right to be. *See id.* (explaining that the mere fact that a person "has taken measures to restrict some views of his activities" does not preclude "an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible").

<u>See also Archer v. Gipson</u>, 108 F. Supp. 3d 895, 907-08 (E.D. Cal. 2015) (finding summary judgment in favor of defendants warranted on plaintiffs' Section 1983 claim alleging Fourth Amendment violation because the items within the curtilage were "readily visible" through a wire fence from code enforcement officer's position on the street).

Although Plaintiffs attempt to show inconsistencies between Defendants' factual assertions in earlier proceedings and now, none are "material." Plaintiffs also quarrel with Defendants' "undisputed facts" but, to defeat summary judgment, Plaintiffs must do more; they must come forward with actual evidence showing that there is a genuine issue for trial.

What the undisputed facts show is that, while knocking on Plaintiffs' front door in the performance of her duties, Adorante observed through the front window dogs and the large boat directly behind the home. Adorante could lawfully walk up to the Thomases' front door to knock and inquire of anyone therein about the dogs locked inside the vehicle. From her lawful position on the front porch, she need not have averted her eyes to items of potential evidentiary value. Ciraolo, 476 U.S. at 213; Jardines, 133 S. Ct. at 1415. Adorante testified that the dogs in the front window were visible from the front door and photographic evidence seems to confirm that. (Doc. 104 at 6; Doc. 114-24; Doc. 114-25.) Similarly, anything visible from the street – like Plaintiffs' two other boats observed by Hadden – is fair game.

Because Adorante was lawfully on the porch to begin with, her actions in looking through the open window (depending on its proximity to the door) are at least arguably within the framework of the "knock and talk" exception or in the performance of her Animal Control duties. However, under cases such as Powell v. State, it is also arguable they were not. 120 So. 3d 577, 580, 586 (Fla. Dist. Ct. App. 2013) ("Because the officers intruded into a constitutionally protected area without a warrant and peered into a window from a part of the property where they had no lawful right to be,

an unconstitutional search occurred."; "Whether two feet or twenty, the distance between the door and window matters little given that the officers said they could not see the plants without leaving the front door step and positioning themselves at a spot where they had no right to be."). Also questionable are Defendants' actions in walking around the side of the house to the fence and looking into the back yard. However, by the time Defendants walked to the side of the house to observe the back yard, they had already seen everything they were going to see: Adorante saw the dogs in the house and the large boat in the back yard, and Hadden observed the two other boats from the position of his truck parked on the street. Nothing was gained by looking into the back yard from their position at the side yard. Moreover, Hadden testified that on his later visits to check on the boat removal, he did not intrude onto the Thomases' property but rather observed the back yard from the adjacent lot. (Doc. 104 at 13.)

The Thomases have raised some legitimate Fourth Amendment concerns. If this was a criminal case involving Fourth Amendment issues, or if the Court was required to determine ab initio whether Defendants' actions were unconstitutional, the Court would undertake such inquiry; but, the very fact that some of Defendants' actions were inarguably permissible and others only arguably problematic, means that Plaintiffs have not been able to show that Defendants violated their "clearly established" constitutional rights. See, e.g., Storck v. City of Coral Springs, 354 F.3d 1307, 1314 (11th Cir. 2003) ("If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity." (citing Hunter v. Bryant, 502 U.S. 224, 228 (1991)).

### B.  42 U.S.C. § 1983 – Substantive Due Process

In Counts Ten and Eleven, Plaintiffs allege that the City and individual Defendants violated their substantive due process rights under Section 1983 and the Fourteenth Amendment. Count Ten alleges, in conclusory fashion, that the City violated Plaintiffs' substantive due process rights by allowing continual and repeated violations by its employees, failing to take corrective and disciplinary actions, and failing to provide a process whereby Plaintiffs could have their complaints of constitutional violations heard. (Doc. 84 ¶¶ 183-93.) Similarly, in Count Eleven, Plaintiffs allege that Defendants Landon, Abreu, Grossman, Chaudoin, and Donovan violated their rights to substantive due process by virtue of their supervisory roles, because each knew or should have known of the alleged repeated violations of Plaintiffs' rights but failed to stop them; each had authority to take corrective and/or disciplinary action against their subordinates but failed to; and each "had little or no knowledge of the Fourth [A]mendment" and "was in, or had the ability to be in, communication withe [sic] each of the other named Defendants[,]" yet "repeatedly chose, individually and/or in collaboration together, to disregard the Constitution." (Doc. 84 ¶¶ 194-202.)

"Conduct by a government actor will rise to the level of a substantive due process violation only if the act can be characterized as arbitrary or conscience-shocking in a constitutional sense." Davis v. Carter, 979, 982 (11th Cir. 2009). To that end, "[t]o rise to the conscience-shocking level, conduct most likely must be intended to injury in some way unjustifiable by any government interest[.]" Id. When determining whether the alleged conduct rises to this level, courts are cautioned that

"[d]eterminations of what is egregious conduct must not be made in the glow of hindsight" but instead must "shock the conscience" at the time of the government actor's conduct. <u>Maddox v. Stephens</u>, 727 F.3d 1109, 1119 (11th Cir. 2013).

None of the Defendants' actions were "arbitrary" or "shock the conscience" in the constitutional sense, nor is there any evidence that their conduct was "intended to injure."

## C.    42 U.S.C. § 1983 – Failure to Train, Supervise, and Discipline

In Counts Thirteen through Sixteen, Plaintiffs allege that Defendants Landon, Abreu, Grossman, Chaudoin, and Donovan, in their individual capacities, failed to train, supervise, and discipline their employees. Plaintiffs seek punitive damages on each count.

As discussed in Part III.A.2.a, <u>supra</u>, to impose supervisory liability under Section 1983, Plaintiffs must demonstrate: "(1) a violation of a constitutional right, (2) a custom or policy constituting deliberate indifference to that constitutional right, and (3) a causal link between the policy or custom and the violation." <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978). Plaintiffs must allege that Defendants "knew of a need to train and/or supervise in a particular area" and "made a deliberate choice not to take any action[,]" which resulted in the constitutional violation. <u>Gold</u>, 151 F.3d at 1350, 1351 n.10. In the Eleventh Circuit, Plaintiffs must also offer proof that the City was aware of a prior incident in which constitutional rights were similarly violated. <u>Church v. City of Huntsville</u>, 30 F.3d 1332, 1342-46 (11th Cir. 1994).

Plaintiffs have not established a prior similar incident in the City. There is no evidence that Defendants <u>knew</u> of a need to train or supervise in a particular area,

and therefore as a matter of law Defendants could not have made a deliberate choice not to take any action.

### D.   Plaintiffs' State Law Claims

#### 1.   Fla. Stat. § 768.28

##### a.   *Pre-suit notice*

Pursuant to section 768.28, Florida Statutes, "[a]n action may not be instituted on a claim against the state or one of its agencies or subdivisions unless the claimant presents the claim in writing to the appropriate agency … within 3 years after such claim accrues and … the appropriate agency denies the claim in writing." Fla. Stat. § 768.28(6)(a). Strict compliance with these conditions precedent is required. Rumler v. Dep't of Corrs., 546 F. Supp. 2d 1334, 1344 (M.D. Fla. 2008). While a complaint filed without first providing the requisite statutory notice should be dismissed with leave to amend, where the time to provide the requisite notice has expired such that strict compliance with the statute is impossible, the complaint must be dismissed with prejudice. Levine v. Dade Cnty. Sch. Bd., 442 So.2d 210, 213 (Fla. 1983).

Here, if the alleged events are viewed as one continuing event occurring between February 25, 2010 and May 27, 2010, Plaintiffs were required to provide the requisite statutory notice no later than May 26, 2013. By Plaintiffs' own admission, they did not provide notice to Jim Landon, in his capacity as City Manager, until April 1, 2014, nearly two months after Plaintiffs filed their initial complaint in this Court and ten months after the three year limitations period expired. (See Doc. 84 ¶ 143.)

Plaintiffs assert that "[t]he claims did not begin to accrue until the [state] Court reversed the decisions of the Code Enforcement Board and the Animal Control hearing

officer." (Doc. 123 at 23.) However, the Florida Supreme Court has considered and rejected this type of argument. In <u>Department of Transportation v. Soldovere</u>, the court considered the question "when a cause of action accrues if a notice of claim for a tort against the appropriate state agency must be filed before suit can be brought," and "rule[d] that the cause of action accrues upon the happening of an accident and the attendant injuries." 519 So. 2d 616, 616 (Fla. 1988). Although the incident underlying <u>Soldovere</u> was a car accident, the court discussed the requirement for negligence actions in Florida generally: "A cause of action for the negligence of another accrues at the time the injury is first inflicted. This rule applies whether the action is against a private party or the state." <u>Id.</u> at 617 (citations omitted). Specifically, the court explained that section 768.28(6) "is merely a procedural requirement and does not abrogate the general rule that a cause of action accrues when the injury occurs and the damage is sustained." <u>Id.</u> This is particularly true where, as here, "the party capable of being sued … has always been available." <u>Id.</u>

Accordingly, Plaintiffs' failure to provide the requisite pre-suit notice necessitates summary judgment on their claims against the City (Counts Twenty (Negligent Infliction of Emotional Distress, to the extent asserted against the City), Twenty One (Negligent Supervision), and Twenty Seven (Negligent Training)).

The notice requirements in section 768.28(6) do not apply to claims against the individual Defendants sued in their individual capacities. <u>Lloyd v. Ellis</u>, 520 So. 2d 59, 60 (Fla. Dist. Ct. App. 1988); <u>Diversified Numismatics, Inc. v. City of Orlando</u>, 783 F.

Supp. 1337, 1346 (M.D. Fla. 1990). However, those claims also fail. See Part III.D.1.b,

infra.

### b.   *Immunity*

Florida's sovereign immunity protects the individual Defendants from personal

tort liability "unless such officer, employee, or agent [of the state or any of its

subdivisions] acted in bad faith or with malicious purpose or in a manner exhibiting

wanton and willful disregard of human rights, safety, or property." Fla. Stat. §

768.28(9)(a). "[C]onduct committed in bad faith has been characterized as conduct

acted out with actual malice[,]" Kastritis v. City of Daytona Beach Shores, 835 F. Supp.

2d 1200, 1225 (M.D. Fla. 2011), and "bad faith" means acting with an "evil intent or

motive." Btesh v. City of Maitland, Fla., No. 6:10-cv-71-Orl-19DAB, 2011 WL 3269647,

*27 (M.D. Fla. July 29, 2011) (citations omitted). Such conduct "must be worse than

gross negligence, and more reprehensible than mere intentional conduct." Kastritis,

835 F. Supp. 2d at 1225 (citations and quotation marks omitted). Here, there is

evidence that the Code Enforcement officers may have responded to the Thomases'

hostility with some hostility of their own.[3] But this evidence does not rise to the level

of actions taken in "bad faith or with malicious purpose or in a manner exhibiting

wanton and willful disregard of human rights, safety, or property." Fla. Stat. §

768.28(9)(a). Defendants are therefore entitled to immunity from Plaintiffs' state law

claims under Section 768.28.[4]

---

[3] See Doc. 114-16 (email chain dated April 21 and 22, 2010).

[4] Because the Court has determined that Plaintiffs' state law claims fail due to
their failure to provide the requisite pre-suit notice to the City and the individual

IV.   **PLAINTIFFS' JOINT MOTION FOR SUMMARY JUDGMENT ON ENUMERATED CLAIMS (DOC. 114)**

For the reasons set forth in Part III, <u>supra</u>, Plaintiffs' motion will be denied.

V.   **PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' FILED AFFIDAVITS (DOC. 116)**

Plaintiffs move to strike Defendants' affidavits filed in support of the motion for summary judgment because: (1) issue preclusion applies; (2) the affidavits are sham affidavits; and (3) the contents include inadmissible evidence. (Doc. 116.) At the outset, the motion to strike is procedurally improper because motions to strike are only appropriately addressed toward pleadings, and documents filed in support of summary judgment are not pleadings. <u>Cableview Commc'ns of Jacksonville, Inc. v. Time Warner Cable Se.</u>, LLC, No. 3:13-cv-306-J-34JRK, 2016 WL 128561, *3 (M.D. Fla. Jan. 12, 2016). The motion will also be denied on the following grounds.

A.   **Issue preclusion**

Federal courts apply the relevant state law of preclusion. <u>Marrese v. Am. Acad. of Orthopedic Surgeons</u>, 470 U.S. 373, 382 (1985) (citing <u>Kremer v. Chem. Constr. Corp.</u>, 456 U.S. 461, 467 (1982), for the proposition that federal courts apply state rules of issue preclusion). "The 'essential elements' of issue preclusion under Florida law are 'that the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction.'" <u>Brown v. R.J. Reynolds Tobacco Co.</u>, 611 F.3d 1324, 1332-33

---

Defendants' entitlement to immunity, the Court need not address these claims on the merits.

(11th Cir. 2010) (quoting <u>Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 945 So. 2d 1216, 1235 (Fla. 2006)).

Unlike the two administrative appeals, which involved only Plaintiffs and the City, there are several named individual Defendants in this federal action so the parties are not identical. Nor are the issues identical. Even if the parties and issues were identical, the issues were not fully litigated. <u>See</u> Doc. 114-15 at 2-3; <u>Thomas v. City of Palm Coast</u>, No. 2010 CA 1202, at 2-3 (Fla. Cir. Ct. June 22, 2012) ("The Court in this case declines to make a ruling on whether the animal control officer's acts violated [the Thomases'] constitutional rights. A review of the record reveals very little evidence of the animal control officer's actions. … Based upon the record in this case, there is insufficient evidence established for a determination of whether or not the animal control officer engaged in an unlawful search and seizure."). To resolve those issues, the Circuit Court remanded the case back to the code enforcement board but rather than relitigate the case, the City dismissed the actions. Plaintiffs thus cannot satisfy all elements required for issue preclusion to apply.

## B.   Sham affidavits

Courts may find that affidavits are shams when they inherently conflict with prior deposition testimony without offering an explanation for the inconsistency. <u>Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.</u>, 736 F.2d 656, 656 (11th Cir. 1984). Put simply, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issues of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." <u>Id.</u> at 657. A court must find that the

prior testimony and affidavit contain inherent inconsistencies before it may disregard the affidavit, and should only do so sparingly in light of the consequences. <u>Allen v. Bd. of Pub. Educ.</u>, 495 F.3d 1306, 1316 (11th Cir. 2007) ("[T]o allow every failure of memory or variation in a witness' testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the … affiant … was stating the truth." (quoting <u>Tippens v. Celotex Corp.</u>, 805 F.2d 949, 953-54 (11th Cir. 1986))). Upon review of Defendants' affidavits, they do not contain such "inherent inconsistencies" to warrant striking them.[5]

### C.   Inadmissible contents

To the extent that Plaintiffs contend that the Affidavits contain inadmissible hearsay, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1323 (11th Cir. 1999) (citations and quotation marks omitted). Here, the information is capable of being reduced to admissible evidence.

---

[5] None of the alleged "inconsistencies" can even be characterized as material. Moreover, the alleged "inconsistencies" are not even really inconsistent, as in the case of Defendant Hadden's response to interrogatory number 18 (in which he states that on the second through sixth visits to Plaintiffs' property he "was adjacent to the neighbor's driveway on the City's right of way to the left of the Thomases [sic] home" (Doc. 122-11 at 10)) and statement in his Affidavit (that he "walked onto the adjacent lot where [he] had a clear view …" (Doc. 104 at 13 ¶ 7)).

## VI.    CONCLUSION

There was unbecoming animosity between the Thomases and the City officials. It also appears that the City of Palm Coast had given little guidance to their officers regarding how the Fourth Amendment applied to their duties. Nor did the City officers show a proper sensitivity or respect for the Thomases' Fourth Amendment rights. There is certainly room for improvement in the City's practices. Nevertheless, on these facts, the <u>actions</u> of the City officers did not violate the Thomases' clearly established Fourth Amendment rights.

Accordingly, it is hereby

**ORDERED:**

1.    Defendants' Dispositive Motion for Summary Judgment (Doc. 103) is **GRANTED** as to Counts One through Thirty Six of the "Third Amended Complaint" (Doc. 84).

2.    Plaintiffs' Joint Motion for Summary Judgment on Enumerated Claims (Doc. 114) is **DENIED**.

3.    Plaintiffs' Motion to Strike Defendants' Filed Affidavits (Doc. 116) is **DENIED**.

4.    The Clerk shall enter summary final judgment in favor of Defendants and against Plaintiffs, and close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 30th day of March, 2017.

TIMOTHY J. CORRIGAN
United States District Judge

ab
Copies:

Counsel of record
Pro se Plaintiffs